**S.G. SUPPLY COMPANY, Plaintiff,**

v.

**GREENWOOD INTERNATIONAL, INC., Defendant.**

**No. 89 C 3276.**

United States District Court, N.D. Illinois, E.D.

April 11, 1991.

Gordon B. Nash, Jr., Peter J. Meyer, Gardner, Carton & Douglas, Chicago, Ill., for plaintiff.

John D. Cassiday, Cassiday, Schade & Gloor, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

As a result of damage from some leaking pipe allegedly sold by Greenwood International, Inc. ("Greenwood") to S.G. Supply Company ("SG"), SG has filed a two-count Complaint against Greenwood:

1. Count I alleges that Greenwood breached its express warranty that the pipe was of a certain type.

2. Count II alleges that Greenwood breached its implied warranty of merchantability, in that (a) the pipe was not fit for the ordinary purpose for which such pipe is sold and (b) the pipe did not conform with the promises and affirmations of fact made on the label.

SG seeks the cost of the labor, material and equipment that were incurred in replacing the defective pipe.

Greenwood has responded with a two-count counterclaim:

1. Count I essentially asserts an affirmative defense of contributory negligence, based on the theory that the failure of SG and contractor Economy Mechanical Industries, Inc. ("EMI") to in-

spect and test the pipe either caused or contributed to the damage.[1]

2. Count II alleges nonpayment by SG for a shipment of pipe that is unrelated to the other pipe at issue in this suit.

Greenwood asks for money relief on those claims.

■ SG has now moved for partial summary judgment on the issue of liability under its Counts I and II and for summary judgment on Greenwood's Count I. Greenwood has filed a cross-motion seeking summary judgment on both of SG's counts and on Greenwood's Count II.[2] For the reasons stated in this memorandum opinion and order, SG's motion is granted on its Count I and II and is granted in part and denied in part as to Greenwood's Count I. Greenwood's motion is of course denied on SG's Counts I and II, while its motion is granted as to its own Count II.

### Facts

SG, an Illinois corporation with its principal place of business in Illinois, is a wholesale distributor of plumbing and piping supplies for construction and industry. Greenwood, an Oregon corporation with its principal place of business in Oregon, is an importer of pipe and related materials.

In March 1987 Greenwood offered to sell and SG agreed to purchase 1,512 feet of 5-inch galvanized steel pipe (the "Pipe").

SG's purchase order requested "A53" pipe with a .258 wall thickness. Greenwood's confirmation stated that it would supply approximately 1,500 feet at a price of $444.50 per 100 feet of pipe, and that the Pipe would be "IMPORT A 120 SCH 40 GPE 5″ × .258 × 21′″" and "ASTM A 120."[3] Both SG and Greenwood agreed to those terms.

"ASTM A 120 Schedule 40" (or "A 120") refers to standard specifications promulgated by the American Society for Testing and Materials ("ASTM") for black and hot-dipped zinc coated (galvanized) welded and seamless pipe. Those ASTM specifications provide that A 120 pipe is intended for ordinary uses in steam, water, gas and air lines. Moreover, the specifications provide that 5-inch galvanized A 120 pipe having a wall thickness of .258 inches should hold a test pressure of 1,200 pounds per square inch ("psi"). They also require the manufacturer to perform hydrostatic tests on each length of A 120 pipe to verify that it meets the specified test pressure of 1,200 psi:

7. *Hydrostatic Test*

7.1 Each length of pipe shall be tested by the manufacturer to the hydrostatic pressures prescribed in Tables 1, 2, 3 or 4. The maximum specified pressure shall not exceed the value given in these tables for the size and kind of pipe.

\* \* \* \* \* \*

---

**1.** Greenwood also advanced the same allegation as an affirmative defense, which it is. This Court will thus regard it as such in accordance with Fed.R.Civ.P. ("Rule") 8(c). Greenwood's Counterclaim Count I also alleged SG's failure (a) to mitigate damages, (b) to train and instruct EMI on how to install the pipe and (c) to equip EMI properly. In its all of its memoranda on the present motions, Greenwood has discussed only the allegation referred to in the text and has offered no evidence on the other affirmative defenses. Accordingly P.R.Mem. 2 n. 1 asks that this Court grant summary judgment as to those issues. Because Greenwood has not addressed them, SG's motion for summary judgment in those respects must be granted (*Skagen v. Sears, Roebuck & Co.,* 910 F.2d 1498, 1500 (7th Cir.1990)).

**2.** Rule 56 principles impose on each movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is "not required to draw every conceivable inference from the record—only those inferences that are reasonable"—in the light most favorable to the nonmovant (*Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) and cases cited there). Where as here cross-motions are involved, that calls for taking opposing perspectives in resolving them. As for the record itself, although the parties have cited incorrectly to the subparagraphs of this District Court's General Rule ("GR") 12(m) and 12(n) requiring factual statements in support of and in opposition to Rule 56 motions, both sides have tendered such statements (cited here as "P. 12(m)—" and "D. 12(n)—" for the statements addressing SG's motion and "D. 12(m)—" and "P. 12(n)—" for the statements relating to Greenwood's cross-motion).

**3.** ASTM A 120 means the same as ASTM A 53.

**20.2 *Responsibility for Inspection*—** Unless otherwise specified in the Contract or purchase order, the producer is responsible for the performance of all inspection and test requirements specified herein.

Finally, the specifications require all pipe represented by the manufacturer to be ASTM A 120 pipe to be labeled as such:

18.1 Each length of pipe shall be legibly marked by rolling, stamping, stenciling to show the name or brand of the manufacturer, the specification number, and the length....

All the Pipe that SG ordered from Greenwood was shipped from its manufacturer Yieh Hsing Enterprise Co., Ltd. ("Yieh Hsing") in Taiwan via Camden, New Jersey to SG's warehouse in Calumet Park, Illinois, where it arrived in September 1987. Its Bill of Lading identified the Pipe as having been ordered by Greenwood and said it was "ASTM A 120/A 53A" pipe, "5″ × .258″ × 21′." All the pipe delivered to SG ("the YH Pipe") was stenciled:

Taiwan YH ASTM Import A 120 Sch 40 GPE 5″ × .258″ × 21′.

"YH" refers to Yieh Hsing, which is also the same company as Yieh Mau Corporation ("Yieh Mau").

Once the YH Pipe had been delivered to SG, Greenwood sent an invoice to SG ("Invoice") dated September 11, 1987, which identified it as "ASTM A 120/A 53A" and as "IMPORT A 120 SCH 40 GPE PIPE" and as "MADE IN TAIWAN" (P.Ex. 7). SG paid Greenwood in full for the YH Pipe on September 25, 1987.

SG's purchasing agent George Mecklenburg ("Mecklenburg") (Mecklenburg Supp. Aff. ¶ 6) states that before the receipt of the YH Pipe from Greenwood, SG had never stocked any other 5-inch galvanized steel pipe made in Taiwan, and that except for the order from Greenwood SG has not purchased any YH or other Taiwanese 5-inch galvanized steel pipe from any supplier (Mecklenburg Aff. ¶ 4). As for EMI, the only Taiwanese 5-inch galvanized pipe that EMI had in its inventory at the time of the Building and to the present date was purchased from SG.[4]

Between December 1987 and July 1988 SG sold 483 feet of the YH Pipe to EMI, a mechanical contractor. Of that, 336 feet were delivered to 900 N. Michigan, Chicago, Illinois for use in a 67-story building (the "Building"). EMI installed YH Pipe on the 9th and 29th floors of the Building for use as a conduit for hot water to a hotel on the 30th–46th floors. There was a heating unit on the 9th floor, from which the water was to be pumped up an elevator shaft to the 29th floor. In turn, the hot water was to be delivered from there to the floors above. As designed, the hot water system in which the pipe was to be used was expected to experience approximately 190–200 psi during operation. Under the Building's construction scheduling the 9th floor had been completed (insulation was installed, etc.) before the 29th floor.

YH Pipe was used on the 9th and 29th floors of the building. And the pipe that leaked and had to be replaced was stenciled with the letters "YH" and the word "Taiwan" (Summers Dep. at 39, 83–84; P.Ex. 9).

In August 1988, after installing the YH Pipe on the 9th and 29th floors of the Building, EMI began to fill the water line with cold water from the 29th floor. That filling of the pipes caused the standing pressure to be about 40 psi of pressure. Shortly thereafter a water leak was observed coming through a ceiling tile on the 9th floor. Upon closer examination, EMI discovered that the water was dripping from two small pieces of YH Pipe. Accordingly the system was drained down and the leaking pipe was replaced.

**4.** This fact was attested to by Larry Keller, EMI's purchasing agent. Greenwood has objected to Keller's testimony being used to establish directly that the YH Pipe was actually used in the building (D. Reply on Motion to Strike Keller's Aff. 3). That is warranted, and this Court will not use his statements for that purpose. However, as discussed below, others have testified that YH Pipe was used in the Building and Keller has stated that the only YH Pipe that EMI purchased was from Greenwood. It is beyond reason to conclude anything other than that the YH Pipe in the building came from Greenwood.

EMI then refilled the system, at which time additional leaks began to appear on other sections of pipe on the 9th floor. Again the water was drained out and the pipe replaced. After another refilling more leaks were discovered. Consequently EMI replaced all of the YH Pipe on the 9th floor.

In August 1988, following notification by EMI to SG of the leaking pipe, SG notified Greenwood that some YH Pipe sold to SG by Greenwood leaked and would have to be replaced. SG also notified Greenwood that it appeared that substantial remedial work would have to be done. In September and October SG sent correspondence to Greenwood's President Michael Summers ("Summers"), informing him that the YH Pipe was defective and needed to be replaced. On October 14, 1988 SG informed Greenwood that Greenwood may be in breach of its contract with SG. EMI then advised Greenwood and Yieh Mau that it was willing to have another contractor do the replacement work under certain conditions. Neither Greenwood nor Yieh Mau agreed to that offer. EMI also suggested that Greenwood have a representative present at the Building on a daily basis to monitor the replacement work. Greenwood chose not to do so.

On November 17, 1988 EMI conducted an air test of the YH Pipe on the 29th floor in the presence of YH representatives. That test revealed leaks in the YH Pipe on the 29th floor after 80 psi of air was put on the pipe. EMI then made a decision to replace the YH Pipe on the 29th floor. Greenwood's President Summers visited the site twice around the same time and later admitted that the defective pipe was YH Pipe and had failed to meet the warranteed specifications.[5] As a result of the leaking water pipes, EMI replaced all the YH Pipe on the 9th and 29th floors. EMI also repaired the damage from the leaks on the 9th and 29th floors. Because the current

motions have focused on liability rather than damages, the magnitude and cost of those repairs and replacements is in dispute.

SG's insurance carrier requested that the pipes be tested. On October 13, 1988 representatives of Taussig Associates, Inc. ("Taussig"), a metallurgical engineering firm, visited the Building to inspect and analyze the YH Pipe installed on the 9th and 29th floors. Samples of the YH Pipe were selected for further analysis and testing at Taussig's laboratory.

■ Lyle Jacobs ("Jacobs"), President of Taussig and a metallurgical engineer, examined the YH Pipe and has been presented as an expert in his field. He also was responsible for overseeing various tests that were conducted on the YH Pipe at the laboratory, including a visual and macroscopic examination, chemical analysis, mechanical testing and metallographic examination. As a result of his firm's examination of the YH Pipe, Jacobs prepared Report No. 82895 dated November 9, 1988 (the "Taussig Report") (Jacobs Aff. Ex. C), which contained the following findings:

> Based upon the preceding tests and examinations, it is our opinion that the five samples of 5″ diameter seam welded, galvanized steel pipe which was to have been manufactured and furnished in accordance with ASTM A120 . . . and capable of withstanding internal pressures of at least 200 psi, exhibited evidence of leakage as the result of intermittent regions in the seam weld that had not been welded. These regions, which were visible externally in the pipe as a result of the visual presence of a "V" groove on the outer surface, had not been welded at all. These areas of lack of welding were open with a complete path through the pipe wall being present at the time of manufacture as evidenced by the presence of a galvanized coating on the sepa-

5. Greenwood's Sur–Reply at 8 argues that Summers' admission should not be believed because not based on knowledge. But Greenwood has presented no evidence to counter Summers' statements, except for the testimony of two other plumbers who have stated that they might

have taken pipe other than the YH Pipe to the 9th and 29th floors. Of course those statements do not at all impeach the overwhelming evidence that there was some YH Pipe on those floors and that it was the YH Pipe that leaked.

rated surfaces that were to have been welded together.

\* \* \* \* \* \*

... [If the pipes had been tested in accordance with ASTM A120] they would have exhibited evidence of leakage at pressure values significantly below the 200 psi required for this particular service application.[6]

Before the YH Pipe began to leak the defects were not visible to the naked eye. Its zinc coating filled the gaps created by the lack of welding, hiding them from visual inspection. All of the YH Pipe was similarly coated. Jacobs Dep. 34–49 and Jacobs Aff. 7 confirm that. SG's purchasing agent Mecklenburg also stated that he inspected the 5–inch pipe on the 9th and 29th floors and that he was unable to detect any defects in the pipe during his visual inspection (Mecklenburg Dep. 77). Summers also confirmed that the defects in the pipe were not visible (Summers Dep. 47, 100).

■ Jacobs Aff. 8 states:

The YH Pipe could not be used in their intended application or for the ordinary purposes for which such pipe is used because the intermittent lack of welding in the seam welds caused them to leak. Leaks would occur in the areas of the pipe where the seam was not welded and at pressures below the intended pressure

of 190–200 psi and far below ASTM A 120–84's requirements of 1200 psi. The weight of the water itself in the pipe, or approximately 70 psi, would cause the pipe to leak where the seam was not welded.

Nothing in the record impairs the probative force of that opinion.[7]

Beginning in November 1988 EMI began to bill SG for the cost of replacing the YH Pipe and for related repairs. It has retained the amount of the total bill—$191,-000—as an offset against money that it owed SG on the account between the companies. EMI's withholding of payments remains constant at $191,000, the alleged cost of damages due to the leaking pipes. SG in turn asks that Greenwood pay SG the same amount of $191,000 for damages due to the leaking pipes supplied by Greenwood.[8]

In connection with Greenwood's Count II, which is unrelated to the other transaction at issue here, SG admits (P.Mem. 1) that on August 10, 1988 Greenwood shipped 2200 linear feet of six-inch import A120/A53GPE pipe with .280 walls in 21 foot lengths to SG. That pipe cost $13,715, and payment was due by June 27, 1989. SG is still in arrears for that amount.

*SG's Motion*

As the president of Greenwood has himself stated (Summers Dep.Ex. 9):

not have been fairly representative, that it could have been the only pipe that was defective or that it might have come from only one floor. Even if such were the case, all the evidence supports SG's assertions that many YH Pipes leaked and that damage resulted therefrom. No evidence points to another cause for the leaks on either floor. And whether or not the "fairly representative" sample issue is as bankrupt as the rest of Greenwood's position, it would have relevance only in the determination of damages, which are not now at issue.

**8.** Greenwood submitted a statement of additional facts purporting to support a denial of summary judgment. Those facts challenge whether SG has suffered any damages (in order to have standing to sue) and whether the level of damages is correct. This opinion discusses the first issue below, but the second is not relevant to the issue of liability. Greenwood is free to challenge the amount of damages at trial.

**6.** [Footnote by this Court] In addition, the Taussig Report offered an opinion about whether tests were actually conducted. Because such an opinion is beyond the knowledge of the expert, it is not admitted.

**7.** Greenwood challenges Jacob's opinion that the weight of the water itself would be 70 psi. Jacobs cannot of course testify as to what the pressure was in the pipe, but he *can* testify as to whether the pipe would leak at that pressure. In addition, Greenwood filed a motion to strike Jacobs' affidavit on the grounds that he had no personal knowledge that the pipe he tested was taken from the 9th and 29th floors of the Building or that they were "fairly representative" samples (D. Motion 2). On the first point, Jacobs' associate George Goodrich ("Goodrich") (Goodrich Aff. 7–8) states that the pipe was taken from the Building, that it was a fairly representative sample and that it was YH Pipe. Greenwood has not offered any evidence to rebut those facts. It surmises that the pipe may

THE ONE IRREFUTABLE FACT IN THIS CLAIM IS THAT THE PIPE WAS MANUFACTURED BY YH STEEL AND THAT IT DOES NOT MEET THE SPECS THAT IT WAS BOUGHT UNDER.

All of the evidence supports that admission, and none refutes it.

SG purchased the YH Pipe under the express warranty that it was A 120 Schedule pipe, which means that Greenwood warranted that it had hydrostatically tested it and that it would withstand up to 1,200 psi of pressure. Accordingly, SG has sued under an express warranty theory under Ill. Rev.Stat. ch. 26, ¶ 2–313: [9]

(1) Express warranties by the seller are created as follows:

(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

In this case, SG clearly ordered ASTM A 120 5–inch pipe. Both parties agree that the designation "ASTM A 120" requires that the pipe be able to withstand 1,200 psi of pressure and that the designation warrants that the manufacturer tested the pipe to meet those standards. Both parties also agree that in addition to the term "ASTM A 120" being a part of the written contract, that term was stenciled on every piece of pipe, further warranting that pipe to be able to withstand the test pressure of 1,200 psi. Finally, the parties further agree that Greenwood shipped SG approximately 1,500 feet of A 120 Pipe. Only one fact is disputed by Greenwood: that its pipe was the same A 120 Pipe that caused the damage in the Building.

SG has also sued Greenwood on an implied warranty theory under UCC § 2–314(2)(a), (c) and (f):

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

\*    \*    \*    \*    \*

(c) are fit for the ordinary purposes for which such goods are used; and

\*    \*    \*    \*    \*

(f) conform to the promises or affirmations of fact made on the container or label if any.

Both parties agree that to satisfy any of those implied warranties, ASTM A 120 5–inch pipe must be able to withstand pressures of up to 1,200 psi and must be able to be used in water lines such as the one in the Building.

■ Again Greenwood does not challenge the theory of liability here. It denies only that the pipe it sold SG was the same pipe that leaked in the Building. Thus the resolution of SG's motion for summary judgment depends on one issue: Was it the same pipe? [10]

It is undisputed that Greenwood sold SG certain YH Pipe. SG has shown—uncon-

---

**9.** Both parties agree that Illinois law—in this instance Illinois' version of the Uniform Commercial Code ("UCC")—governs SG's claims against Greenwood. This opinion will cite the Illinois Commercial Code as "UCC § —," as the sections relevant to this case are identical to the respective sections of the UCC.

**10.** Greenwood states (P. Response Mem. 3) that the remaining issues are:

1. Whether the defendant was the vendor of this pipe;

2. Whether the pipe was defective;

3. Whether the sole proximate cause or contributing cause of the damage was failure to inspect and test the pipe by Plaintiff and EMI;

4. Whether documentation submitted by Plaintiff is so lacking in credibility that a trial is required just to determine the credibility of Plaintiff's witnesses.

Issues 1 and 2 deal with the identity of the pipe issue, because Greenwood does not deny that some pipe was defective—it only denies that the defective pipe was the same pipe it sold to Greenwood. Issue 3 is dealt with below. Issue 4 as it relates to the liability question does not state a material issue of fact, because on all the relevant points SG's evidence is uncontroverted and in many cases corroborated by Greenwood or YH. As issue 4 relates to the level of damages, Greenwood may readdress it at trial.

troverted by Greenwood—that it sold 483 feet of that YH Pipe to EMI, 336 feet of which was delivered to the Building. SG has also offered evidence that it and EMI had no other source for YH Pipe. Therefore, the facts show beyond dispute that the YH Pipe that was in the Building was the same YH Pipe that was sold to SG by Greenwood. It is equally clear from the evidence that of the YH Pipe in the Building, some of it was installed on the 9th and 29th floors. Thomas Sherlock ("Sherlock"), a plumber who worked on the system for EMI, testified (Sherlock Dep. I–33 [11]):

> All I know is that when we were up on the floor, there was YH Taiwan pipe up on 29 that was leaking that we replaced.
> Q. Did you replace all of the YH pipe on 29?
> A. Correct, to the best of my knowledge.

Sherlock later showed Summers the pipe that had been taken out (Sherlock Dep. II–106). That pipe was clearly marked as "YH Taiwan" and "ASTM 120." SG President Norman Weiss ("Weiss") testified (Weiss Dep. 51) that the pipe that he saw at the building was marked "YH" and that it had a defect in the seam. Summers himself admitted that he has no proof that the pipe was not supplied by Greenwood (Summers Dep. 37). He also corroborates Sherlock's and Weiss' testimony (id. 39):

> The Witness: I saw pipe on the ninth and 29th floor that was stamped with YH on the pipe.
> Q. (By Mr. Meyer) So you're not claiming that that's not YH pipe?
> A. No, no way.

In addition to the fact that YH Pipe had been installed on the 9th and 29th floors, is a plain fact that on each of those floors there was YH Pipe that leaked.[12] Sherlock testified that he "was on the job" when it was first discovered that the YH Pipe on 29 was leaking (Sherlock Dep. I–80). He then testified how he went and examined the pipe and personally saw that it was leaking (id. at 81–84). When asked whether the leaking was visible to him, he answered (id. at 84):

> Something visible to see the water coming out of it. But when you looked at it up in the ceiling chase, you couldn't tell until we took the pipe out and looked in, then you could tell it was definitely the seam.

In the face of this and other testimony (specifically that of Sherlock and Jeff Andrzejewski, project manager at EMI), Greenwood suggests that this Court should not believe SG's evidence because it is "peculiarly within the knowledge of SG Supply's witnesses." Greenwood cites *Subin v. Goldsmith*, 224 F.2d 753, 758 (2d Cir. 1955) for that proposition. But like the rest of Greenwood's bogus defenses, that mischaracterizes both *Subin* and the facts here. *Subin, id.* specifically holds that when a summary judgment motion depends entirely on *affidavits* of witnesses that have asserted information:

> peculiarly in the knowledge of [the movants] or their witnesses, ... [the nonmovant should] have the opportunity to impeach them at a trial.

■ That is simply not the case here. Apart from the fact that Sherlock's testimony was made by deposition, not by affidavit,[13] his statements have been corrobo-

---

**11.** Sherlock's deposition occupies two volumes, cited here (in a real demonstration of imagination and ingenuity) "I—" and "II—."

**12.** D. Sur–Reply 5 suggests that there is a material issue of fact as to whether there were other brands of pipe on the 9th or 29th floors. From the evidence, the two other kinds of pipe that might have been present would have been Canadian or Domestic pipe. Whether the YH Pipe was the sole kind of pipe in the leaking system is *not* the issue, because only the YH Pipe was found to be leaking and was replaced. Greenwood has offered no evidence that any other

pipe leaked. Indeed, the only evidence that any other brand of pipe was even tested was from the testimony from Sherlock, who stated that he tested the Canadian pipe between the 9th and 29th floors and found that there were no leaks (Sherlock Dep. II–37–38).

**13.** Evidence is of course evidence, whatever form it may take. But anyone with even a modicum of experience knows that the form (if not the content as well) of affidavits is invariably lawyer-prepared, with the opportunity to introduce subtleties of language or meaning or both. Live testimony comes directly from the

rated by other witnesses including Greenwood's own president. Even more significantly, the fact that there was defective YH Pipe on the 9th or 29th floors was not solely within the "knowledge" of SG. SG notified Greenwood of the problem with the YH Pipe soon after it was found. Greenwood and Yieh Mau responded by visiting the scene to see for themselves. Both Greenwood's president—who visited twice—and the representative from Yieh Mau have admitted that YH Pipe was on those floors.

After his visit Summers was satisfied enough with his identification of the YH Pipe to acknowledge to SG that the defective pipe was indeed YH Pipe and that it was defective (P.Ex. 9). Shortly thereafter (on November 29, 1988) Summers wrote to Yieh Mau (P.Ex. 19):

YOU WITNESSED THE TEST AND SUBSEQUENT LEAKS ON THE 29TH FLOOR AND ALSO SAW THE DEFECTIVE PIECES OF PIPE THAT HAD ALREADY BEEN REMOVED FROM THE 9TH FLOOR DURING YOUR INSPECTION. THIS DECISION TO REMOVE THE REMAINING DEFECTIVE PIPE SHOULD COME AS NO SURPRISE TO YOU.

On December 2, 1988 Summers wrote to Yieh Mau again (P.Ex. 22):

THE TRUTH IS OFTEN A BITTER PILL TO SWALLOW BUT IN THIS CASE THE TRUTH IS PLAIN TO SEE. YIEH MAU SHIPPED DEFECTIVE PIPE THAT WAS INSTALLED PER U.S. BUILDING CODES IN THIS BUILDING. ALL WORK TO DATE BY THE INSTALLERS HAS BEEN DONE TO U.S. STANDARDS AND BY ACCEPTABLE U.S. METHODS. THE PIPE CLEARLY DOES NOT MEET THE ASTM MINIMUM STANDARDS CERTIFIED BY YIEH MAU. YOU HAVE BEEN ALLOWED TO INSPECT THE PIPE, WITNESS TESTING OF THE PIPE AND ASK QUESTIONS YOU LIKE TO ALL PARTIES CONCERNED.

On December 12, 1988 Yieh Mau responded to Summers (P.Ex. 33):

IN VIEW OF 5″ PIPE CLAIM PECUNIARY, AFTER OUR COMPANY FURTHER STUDIED AND CONSIDERED, WE SUPPOSED SOME OF CLAIM LIST THAT SHOULD BE UNDERTAKEN BY OUR COMPANY IS UNREASONABLE, T.E. OVERWORK/OVERTIME PAY, AND ETC. SURELY, WE HAVE CONVINCED THAT THERE ARE SOME NEGLIGENCES ON OUR PIPE MAKING. BASED UPON THIS FACTOR, WE WILL BEAR THE MATERIALS EXPENSES, RESULTED FROM THE REPLACEMENT OF UNQUALIFIED PIPES ON E.M.I. CONSTRUCTION.

In sum, the uncontroverted testimony traced YH Pipe from Yieh Mau (ordered through Greenwood) to SG to EMI at the Building and then to the leaking YH Pipe. No other source for the leaking Pipe has been identified. Only one conclusion could be drawn by any reasonable factfinder: All the suspect pipe was the same YH Pipe on which Greenwood had provided a warranty to SG.

There is also no question that it was YH Pipe that Taussig tested. Goodrich, the Senior Metallurgical Engineer at Taussig, stated that pipe marked with the letters "YH" and the word "Taiwan" was taken out of the Building from which it was delivered to Taussig for testing (Goodrich Aff. 2). After his visit to the site, Summers acknowledged that the pipe tested by Taussig was YH Pipe (Summers Dep. 49). That revealed that the tested YH Pipe was defectively manufactured. It lacked complete seam welds, and that defect necessarily caused the YH Pipe to be unable to withstand the pressures for which it was

witness, and the opportunity to cross-examine during a deposition gives opposing counsel the ability to lay bare any areas of doubt or dispute in a manner not available with an affidavit. Indeed, that distinction is at least one reason

that supports the familiar summary judgment principle that post-deposition affidavits at odds with earlier sworn testimony will not be credited as creating a genuine issue of fact (*Bank Leumi*, 928 F.2d at 237 and cases cited there).

warranteed (up to 1,200 psi). In fact, it could not even withstand 70 psi pressure.[14]

Greenwood suggests that there are other explanations for this coincidence of testimony (for example, fraud by Sherlock, mix-ups in different varieties of pipe, etc.). But such flights of fancy and speculation, wholly devoid of any proof, are of no force here. Greenwood (and likewise Yieh Mau) had every opportunity to gather evidence that some other pipe was causing the leaks. Instead, when their representatives went to the scene they acknowledged that the leaking pipe was YH Pipe sold by Greenwood. Thus Greenwood's current argumentation raises no more than a discreditable suggestion that the pipe that it sold may not have been the leaking pipe in the Building.

If any litigant were able to raise such innumerable ungrounded hypotheses as a substitute for proof, summary judgment would never be appropriate. In similar circumstances Judge Learned Hand stated long ago (*De Luca v. Atlantic Refining Co.*, 176 F.2d 421, 423 (2d Cir.1949)):

> True, it may be too strong to say that it is impossible to conjure up any conceivable answer to them. The original may have been forged; the authentication may be false; there may be a "surrender of authority" on file which the custodian failed to find. But if a motion for summary judgment is to have any office whatever, it is to put an end to such frivolous possibilities when they are the only answer.

And that remains good law today from the highest of authorities—*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986) (citing *De Luca*, citations and footnote omitted) also teaches:

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.

Greenwood has failed to offer anything other than such a "metaphysical doubt" (if that) here. This Court finds that the uncontroverted evidence establishes beyond peradventure that the pipe that Greenwood sold to SG was defective and caused damage. That answers the question of liability in the absence of any affirmative defenses by Greenwood, to which this opinion now turns briefly.

### Greenwood's Affirmative Defenses

Greenwood has offered two affirmative defenses:

1. SG does not have standing to bring this suit against Greenwood.

2. SG's and EMI's failure to inspect the pipe was the proximate cause of all the damage.

Neither defense has any more merit than Greenwood's already-discussed arguments—that is, none at all.

### Standing.

Greenwood claims that SG's claims, which were made under a breach of warranty theory, are essentially claims for indemnity and that such an action cannot be brought by SG until it has either been "found liable or has settled" (citing *In re Johns–Manville*, 516 F.Supp. 375, 376 (N.D.Ill.1981)). But there are two equally fatal flaws in Greenwood's theory:

1. SG has not sued Greenwood under an indemnity theory.

2. Even if this had been an indemnity action, SG has suffered damages here and therefore has standing to sue.

Under a breach of warranty theory, SG can sue whether or not it has already paid on a claim against it. 4 Anderson, *Uniform Commercial Code* § 2–715:47, at 535 (Lawyers Co-op 1983) (footnotes and citations omitted) explains:

> When a seller sells with a warranty knowing that his buyer will resell with the same warranty, the buyer may sue the seller for breach of that warranty and recover as consequential damages for the liability which the buyer will sus-

---

**14.** Sherlock Dep. II–88–89 corroborates Jacobs' testimony. Sherlock testified that he allowed water into the system at a standing pressure of no more than 40 psi pressure when it began to leak (*id.*).

tain to his purchasers, and, so long as the buyer proves the probability that he will be sued, it is immaterial that he has not been sued and made to bear the loss by such customers, and recovery is measured by the probable liability of the buyer to the subpurchasers.

To the identical effect, 11 Williston, *Contracts* § 1355, at 285 (footnote and citations omitted) teaches:

And even though the original buyer has not yet been held liable to his subvendee, the amount of his probable liability may be recovered from the original seller.

In breach of warranty terms, then, SG could have sued Greenwood whether it had already sustained a loss or not. But SG need not rest its right to sue on that theory alone, because it *has* sustained damages. Weiss Dep. 69 explains that EMI first sent a bill to SG on February 22, 1990 (see Sherlock Dep.Ex. 6) that reflected the repairs for which EMI was holding SG responsible. Weiss Dep. 71 also states that the amount of $191,000 has been consistently deducted from the amounts that EMI owes SG on a revolving account:

In other words, they are holding back $191,000. As Weiss explained further (*id.* at 73):

[T]heir position was to continue to deduct [the deficit of $191,000]; hold back the money until this was resolved.

SG's controller and chief financial officer R.M. Aldridge ("Aldridge") stated (Aldridge Aff. ¶¶ 5–11) that EMI has billed SG in the amount of $191,479.58 and has withheld an amount of $191,000 from its payments to SG on a revolving basis. That amount has not been withheld from particular bills or contracts. Instead, all those bills are being paid (albeit slowly), but the reason that EMI has not paid SG $191,000 is that it has billed SG that amount. SG has not sued EMI on that amount, nor has it denied liability for the repairs. In fact, SG's entire case is premised on its acknowledgement that damage did occur as a result of defective pipe that it supplied to

EMI. It may not now assert against EMI a position that it did not sell to EMI YH Pipe that was defective. Only one issue is not now certain—the exact amount of damages—and that is left to be determined by a trial.

Greenwood's final argument that SG does not have a right to sue is based on the theory that even if SG has been damaged, it must wait until it is sued by EMI before it presses its claim against Greenwood. That has already been rejected as a misstatement of the law under a straight breach of warranty action. But even if this were an indemnity action, *Bethlehem Steel Corp. v. Chicago Eastern Corp.*, 863 F.2d 508, 521–22 n. 15 (7th Cir.1988) dispels Greenwood's theory:

The district court apparently reasoned that because [the counterplaintiff] repaired its customers' grain bins when they complained of the fracturing without requiring these customers to bring a lawsuit, [the counterplaintiffs] could not allege a claim for indemnification.

Although we have not located any authority directly addressing this issue, we are doubtful that this is the proper approach under Illinois law. [discussing Illinois Appellate Court decisions]

\* \* \* \* \* \*

A rule requiring a lawsuit to actually be filed before an indemnification suit could be brought would force the indemnitee to refrain from settling in order to preserve its cause of action. This would only impose additional costs on the parties without any corresponding benefit. The prospective indemnitor is protected from volunteer payments by the "reasonable anticipation" requirement the same as if a lawsuit was actually brought.

In short, SG has every right to sue Greenwood for damages as a result of the defective YH Pipe.

*Alleged Failure To Inspect.*

■ Greenwood has also asserted that SG and EMI failed to inspect the pipe.[15]

---

**15.** Greenwood also asserts that EMI should have tested the pipe for leaks before installing the insulation (P. Response Mem. 15). If SG or

EMI were in fact negligent in failing to test the pipe before the installation of insulation, Greenwood may have the damages reduced (see, e.g.,

At the core of the failure-to-inspect contention is the assertion by Greenwood that the pipe had an obvious flaw that should have been seen by either SG or EMI: certain "V" grooves that were seen on some of the pipe that was tested by Jacobs. Greenwood asserts that the presence of such a "V" groove on pipe "should have alerted S.G. Supply that further inspection and/or testing was necessary" (P. Response Mem. 13).

Both Greenwood and SG agree with *Blommer Chocolate Co. v. Bongards Creameries, Inc.,* 644 F.Supp. 234, 237 (N.D.Ill.1986) that SG and EMI had a duty to find the lack of seam welds in the pipe:

only if the defect was blatantly obvious beforehand, so that even a cursory visual inspection would have revealed it.

Greenwood has offered no evidence whatever that the miswelding was evident in any way by a visual inspection. Greenwood mischaracterizes Jacobs' testimony by suggesting that it establishes that the pipes had "V" grooves on them and that such grooves should lead one to look for the lack of seam welds. Quite to the contrary, Jacobs plainly stated that the intermittent seam welds could *not* have been detected visually because the seams were covered by the zinc coating (Jacobs Aff. ¶ 18).[16] Jacobs Dep. 38 states:

*Frazer v. A.F. Munsterman, Inc.,* 123 Ill.2d 245, 269, 123 Ill.Dec. 473, 483, 527 N.E.2d 1248, 1258 (1988) (citations omitted) ("the buyer's negligence or fault only mitigates or reduces the damages the buyer may recover.")). Greenwood has offered some evidence that it might have been reasonable for SG to test the pipe prior to insulation. While that may be true, Greenwood has not shown that SG or EMI had any duty at any time to inspect the pipe for leaks in the seam welds. UCC § 2–715, Committee comment 5 states:

Where the injury involved follows the use of goods without discovery of the defect causing the damage, the question of "proximate" cause turns on whether it was reasonable for the buyer to use the goods without such inspection as would have revealed the defects.

See also *Indust–Ri–Chem Laboratory, Inc. v. Par–Pak Co.,* 602 S.W.2d 282, 292 (Tex.Civ. App.—Dallas 1980):

Accordingly, we hold that where, as here, a defect in the goods cannot be discovered by inspection, it is not unreasonable for the buyer to use them without testing unless circum-

The galvanizing covers it and essentially masks any possible crack or makes it difficult to tell what you have.

Jacobs Dep. 35–34 states:

Q. Now, is that something unusual to see [a "V" groove] in a finished galvanized pipe?

A. Not necessarily, sir. Again the galvanized appeared visible inside of the groove. It could have been a die mark....

If I had been informed—well, as I was informed that there was a problem with this pipe, I was specifically looking for some sort of linear indication such as this V-groove.

If I has just been looking at the pipe without knowing there was a problem in the pipe, I might not have paid any attention to it.

Q. Does a V–Groove automatically mean there is going to be a leak?

A. No, sir.

Jacobs Dep. 35–37 elaborated:

The presence of this V-groove doesn't mean necessarily that there was a leak.

\* \* \* \* \* \*

... Again that could just be a linear indication on the pipe which, by itself, doesn't mean anything. Linear indica-

stances exist that would put a reasonable man on notice of the defect and cause him to perform a test that would disclose the defect. Furthermore, the evidence suggests that if EMI had tested the pipe it would have been looking not for improperly welded pipe but for other defects (such as poor connections). Coincidentally, it had not covered the "joints and connections" with insulation (P. 12(m) ¶ 36—uncontroverted and thus admitted by D. 12(n)). Nothing in the record suggests that EMI was put on notice that it needed to test the system to look for the kind of catastrophe that befell its system. However, it is unnecessary to resolve the matter at this time. As SG correctly points out, this Greenwood theory addresses not liability but the amount of damages, which will be determined at trial.

**16.** In fact, at page 4 of its Reply to SG's Response to Greenwood's Motion to Strike Jacobs' Affidavit, Greenwood uses Jacobs' testimony to establish that it would have been impossible for Goodrich to determine whether the samples he took were representative because the seams were masked by the zinc coating.

tions are not necessarily indications of defects.

In fact, the space in the metal was "about ten-thousands of an inch" (*id.* at 49), making it difficult to observe, especially when the zinc coating obscured the weld. Jacobs Dep. 51 also emphasized that the zinc coating could continue to mask the improperly welded seams even after water was introduced into the system. Moreover, Jacobs was not the only person who inspected the YH Pipe. Mecklenburg testified that when he inspected the pipe he could not see the defects (Mecklenburg Dep. 66–78). Greenwood's own President Summers also could not detect any visible defects (Summers Dep. 100). Summers also stated that when he saw the pipe that had reportedly been taken out and that was allegedly defective, "to the naked eye it was very hard to tell one part from another" (Summers Dep. 47).

It is thus plain from the facts that there is no evidence at all that SG or EMI were put on notice that the YH Pipe was defective until it began to leak. Greenwood's affirmative defense that SG and EMI failed to inspect the pipe fails, and SG's motion for summary judgment as to that issue in Greenwood's Count II is granted. As n. 15 explains, the affirmative defense of failure to test may be addressed by Greenwood at trial.

### Greenwood's Count II

SG admits (P.Mem. 1) that on August 10, 1988 Greenwood shipped 2200 linear feet of six-inch import A120/A53GPE pipe with .280 walls in 21–foot lengths to SG. As already stated, that pipe cost $13,715, and payment was due by June 27, 1989. SG is still in arrears for that amount.[17] Accordingly, Greenwood's motion for summary judgment on its Counterclaim Count II is granted.

■ In expectation of this Court's awarding judgment on Greenwood's Count II, SG has requested that this Court stay execution of the award pending the resolution of its claims against Greenwood. No such stay is needed, for the ruling on that count is not a final order (and it is hence neither appealable nor enforceable) in the absence of a Rule 54(b) determination and direction for final judgment by this Court.[18] Under the circumstances, where Greenwood's liability will surely beggar the amount of its Count II claim, this Court will not even pause to consider invoking Rule 54(b).

### Conclusion

Because there is no genuine issue of material fact as to the liability of Greenwood on Counts I and II of SG's Complaint, SG is entitled to a judgment as a matter of law on the issue of liability. But because there is an issue of material fact regarding the possible reduction of damages for an alleged failure to test, SG's motion for summary judgment as to Greenwood's Counterclaim Count I (treated as an affirmative defense) is denied. SG's motion is granted, however, as to the remaining issues addressed in its Count II. There is no genuine issue of material fact, and Greenwood is entitled to a judgment as a matter of law, as to Count II of its Counterclaim. Like SG's victories to this point, that partial ruling in Greenwood's favor is not a final judgment. It is not entitled to execute upon or otherwise enforce it.

### APPENDIX

For the most part the conduct of lawyers in litigation falls somewhere well into the mid-range between the Pollyanna-like characterization of lawsuits as a "search for truth" and the late great Judge Jerome Frank's sardonic observation that "most lawsuits are won on a balance of the perjury." Conventional advocacy usually dictates modifying the first characterization to "I'll do my job for my client and let the judge (or jury) worry about finding out

---

**17.** It is obvious that SG, justifiably frustrated by Greenwood's stonewalling on its own much larger liability, engaged in some self-help of a more limited nature. See the Appendix.

**18.** Neither side seems to have understood that, for they occupy a good deal of time arguing about a stay of execution and whether any stay should be granted only on conditions.

which version is the truth." Ethical considerations (we hope) militate against carrying Judge Frank's second characterization into practice.

Thus the pristine ideal of the search for truth is served only indirectly, at best, by the adversary system. It is consequently all the more distressing when a lawyer's activity within the large area between those polar extremes takes the form seen here on the part of Greenwood's counsel. One important understanding that is essential to entitle the bar to speak of itself as a "profession"—separating itself from the morals of the marketplace—is that if an honest inquiry into the facts and law tells the lawyer that his or her client is wrong, the lawyer should not only advise the client to that effect but should also insist that the client honor the obligations that are in dispute.

Hallowed constitutional safeguards in the criminal law context call for a different standard. Given the presumption of innocence, the burden on the prosecution to adduce proof beyond a reasonable doubt and the existence of the privilege against self-incrimination, trial lawyers for criminal defendants may have the affirmative responsibility to put the government to its burden. Nothing compels them to mandate or even counsel their clients' surrender of those rights.

But that does not translate into the civil practice. There is simply no justification for the lawyer—whether business advisor or transaction lawyer or one who concentrates his or her practice in litigation—taking advantage of the built-in delays and technical requirements of dispute resolution through the courts, using them as a vehicle to deter or block entirely the payment of what investigation has disclosed to be a just obligation. And if the *existence*

of such an obligation is plain but the *amount* is not, the identical principle calls for the lawyer to acknowledge the former even while prepared to challenge the latter in good faith—thus narrowing the controversy to matters that are really in dispute and lessening the waste of both time and money for litigants and court alike.

It should be plain from this opinion that this Court perceives Greenwood's lawyers as sadly deficient in those terms. There is not the slightest question that it was the YH Pipe product that their client sold to SG that was defective and that caused the damage at the 900 North Michigan Avenue Building. Yet they have stonewalled,[1] advancing arguments that can only be labeled as frivolous, instead of forthrightly acknowledging the situation and addressing whatever issues (if any) remained for resolution after Greenwood's liability was admitted.[2]

There is a good deal of concern today (as always) about various ills of the profession. Lawyers enjoy (?) low esteem in every public opinion poll that seeks to rate what the public thinks about people in various occupations. Those public perceptions, and concerns for the greater truth behind them, have in part led to the requirement that law schools include professional ethics in their curricula. But as long as established practitioners such as Greenwood's counsel act as though they pride themselves on such hardball tactics, the public will continue to regard lawyers as pettifoggers.

Because it is to be regretted that something on these lines ever needs to be said, this Appendix ought to end on a constructive note. Just one redeeming feature has marked the current briefing and the generation of this opinion: the first-rate work of this Court's law clerk, J. Robert Robertson, Esq. in converting the parties' bulky and convoluted materials into manageable form

---

1. That course of conduct has also created an inordinate and unjustified burden on this Court in having to wade through the ocean of paper that counsel submitted, in order to make sure (as seemed apparent from the beginning and indeed proved to be the case) that no potentially outcome-determinative factual issue lurked somewhere in the mass of material that would

bar summary judgment as to Greenwood's liability.

2. It does not justify counsel's course of action that Greenwood will have to pursue its seller after making good its liability to SG. After all, SG dealt with Greenwood and is entitled to look to *its* seller.

and in producing a lucid draft opinion—really despite the murkiness generated by counsel's efforts spoken of earlier in this opinion. Although any flaws that may be found in this final opinion are of course this Court's and not those of its law clerk, the end product would not have been possible without that invaluable input.