Haim SHALIT, Plaintiff–Appellant,

v.

Cheryl COPPE, a/k/a Cheryl Gardner Shalit, Defendant–Appellee.

No. 99–35004.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1999.

Decided July 23, 1999.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 14, 1999.

Alison E. Mendel, Mendel & Huntington, Anchorage, Alaska, for plaintiff-appellant.

Kenneth C. Kirk, Anchorage, Alaska, for defendant-appellee.

Before: LAY,[1] GOODWIN and McKEOWN, Circuit Judges.

1. The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

McKEOWN, Circuit Judge:

In this difficult case of first impression, we are called upon to decide whether the son of an American mother and an Israeli father must be returned to Israel on the alleged basis that the mother's retention of the child in Alaska was "wrongful" within the meaning of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,-670 (the "Hague Convention").

The parties, Haim Shalit and Cheryl Coppe, were divorced in Alaska in 1989. The Alaska state court granted the mother custody of their son, Yarden, with visitation rights for the father. On the basis of a subsequent oral agreement, in 1995 Yarden moved to Israel to live with his father on a temporary basis. At the end of what was expected to be a two-week vacation in 1998, Coppe kept Yarden in Alaska. Shalit filed a petition in federal district court in Alaska under the Hague Convention, claiming that Coppe wrongfully retained Yarden in violation of the Convention, and requesting that Yarden be returned to Israel for the Israeli courts to decide the merits of the custody dispute.

Upon consideration of the parties' cross-motions for summary judgment, the district court granted Coppe's motion for summary judgment, finding that Shalit failed to establish that Coppe's retention of Yarden was "wrongful" under the Hague Convention. We agree and affirm.

## BACKGROUND

Shalit and Coppe married in 1985. In 1989, the Alaska Superior Court entered a decree of divorce, granting Coppe "sole legal and physical custody" of Yarden, then two years old. In 1992, the matter of custody was raised again; the state court ordered custody to remain with Coppe and set forth certain visitation provisions. Less than a year later, the parties reached a settlement regarding visitation details, including visitation with the father in Israel. The court adopted the settlement agreement nunc pro tunc and entered Findings of Fact and Conclusions of Law.

The agreement provided that "[j]urisdiction of the courts of the State of Alaska shall be retained" and designated a specific state court judge to resolve "formal disputed issues."

In 1995, Shalit and Coppe orally agreed that Yarden would live with his father in Israel for three years so that Coppe could attend law school. This arrangement appeared to work satisfactorily for some time, with Coppe and Yarden visiting each other several times during those years, although Coppe did not remain in law school. Shalit and Coppe did not put the agreement in writing, did not amend the Alaska orders, and did not discuss a specific date when Yarden would return to his mother.

On August 2, 1998, Yarden traveled from Israel to Alaska to visit his mother, holding a round-trip ticket with a return date of August 19, 1998. During the stay, however, Coppe decided that she would not return Yarden to Israel, claiming alternately that she had concerns about his behavior and care and that the three-year agreement had expired. Yarden has since remained in Alaska.

After Shalit was notified that Yarden would not return to Israel, he commenced a custody proceeding in Israel (which apparently has not progressed beyond the initial filing), followed by the filing of a visitation modification proceeding in Alaska state court. The Alaska Superior Court denied him relief and Shalit then filed his petition in federal court under the Hague Convention. Upon consideration of cross-motions for summary judgment, including declarations and briefing from both parties, the district court found that Shalit had not established that Yarden was wrongfully retained in Alaska within the meaning of the Hague Convention and denied Shalit's petition.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, *Mar-*

*golis v. Ryan,* 140 F.3d 850, 852 (9th Cir. 1998), and the denial of a motion for reconsideration for an abuse of discretion, *Fireman's Fund Ins. Cos. v. Alaskan Pride Partnership,* 106 F.3d 1465, 1470–71 (9th Cir.1997). In a case brought under the Hague Convention, we review the district court's findings of fact for clear error and its conclusions about United States, foreign, and international law de novo. *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir.1996) (*"Friedrich II "*) (citing, *e.g.,* Fed R. Civ. P. 44.1; *Echeverria–Hernandez v. INS,* 923 F.2d 688, 692 (9th Cir. 1991) (question of international law reviewed de novo)).

## DISCUSSION

Shalit's petition seeking Yarden's return is governed by the Hague Convention and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610.

## I. FRAMEWORK OF THE HAGUE CONVENTION

■ The Hague Convention, adopted in 1980, addressed the increasing problem of international child abduction in the context of international law while respecting rights of custody and visitation under national law. According to the Preamble, the Convention aims "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence. . . ." Hague Convention, Preamble, T.I.A.S. No. 11,670 at 4. The twin objectives of the Hague Convention are (1) "to secure the prompt return of children wrongfully removed [ ] or retained," and (2) "to ensure that rights of custody and of

access under the law of one Contracting State are effectively respected in the other Contracting States." *Id.,* àrt. 1; *see also In re Prevot,* 59 F.3d 556, 558 (6th Cir. 1995).[2] One of the paramount purposes of the Hague Convention is to "restore the status quo and deter parents from crossing international borders in search of a more sympathetic court." *See Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 376 (8th Cir. 1995).

Against this backdrop, Article 3 of the Hague Convention spells out the parameters for determining whether a child has been wrongfully removed or retained. Removal or retention of a child is wrongful where:

a. it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been. so exercised but for the removal or retention.

Hague Convention, art. 3, T.I.A.S. No. 11,-670 at 4. Because the language of the Convention is somewhat conclusory, United States courts look to two sources of official commentary for guidance: (1) the Explanatory Report by Elisa Perez–Vera, the official Hague Conference reporter (the "Perez–Vera Report"),[3] and (2) the Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction ("Legal Analysis") found in the Federal Register. 51 Fed.Reg. 10503 (1986).[4] As the Legal Analysis notes:

[The Perez–Verez] explanatory report is recognized by the Conference as the

---

**2.** The United States and Israel are both signatories to the Hague Convention. Hague Conference on Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction, 33 I.L.M. 225, 225 (1994).

**3.** *Actes et documents de la Quatorzieme Session (1980), Volume III, Child Abduction,* edited by the Permanent Bureau of the Hague Conference on Private International Law, The Hague, Netherlands.

**4.** Not surprisingly, the case law in this area is very fact-specific and dependent on the applicable country or state law for the determination of "rights of custody" under the Convention. While we can glean from the cases a framework for analysis that conforms to the Convention, in a case such as this one, we have no precedent in our circuit and little guidance from the other circuits.

official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it.

*Id.*

We underscore that the Hague Convention analysis is *not* a determination of custody rights. Under Article 19 of the Hague Convention and 42 U.S.C. § 11601(b)(4), "a United States district court has authority to determine the merits of an abduction claim, but *not the merits of the underlying custody claim.*" *See, e.g., Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir.1993) ("*Friedrich I*") (citing 42 U.S.C. § 11601(b)(4)) (emphasis added). The court is to determine only whether the removal or retention of a child was "wrongful" under the law of the child's "habitual residence," and if so, to order the return of the child to the place of "habitual residence" for the court there to decide the merits of the custody dispute, unless the alleged abductor can establish one of a few defenses. *See, e.g., Ohlander v. Larson,* 114 F.3d 1531, 1534, 1541 (10th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 702, —— L.Ed.2d —— (1998); *Friedrich II,* 78 F.3d at 1067. The Legal Analysis states the proposition clearly:

> The obligation to return an abducted child to the person entitled to custody arises only if the removal or the retention is wrongful within the meaning of the Convention.

51 Fed.Reg. at 10506.

## II. SHALIT'S PETITION AT SUMMARY JUDGMENT

In his petition, Shalit alleged that Yarden must be returned to Israel because

Coppe's retention of Yarden was "wrongful" under Article 3 of the Hague Convention. Shalit had the burden of proving by a preponderance of the evidence that (1) Coppe retained Yarden away from his "habitual residence," and (2) Coppe's retention of Yarden was in breach of Shalit's rights of custody under the law of Yarden's habitual residence. *See, e.g.,* 42 U.S.C. § 11603(e)(1); *Friedrich I,* 983 F.2d at 1400. The district court correctly found that Israel was Yarden's habitual residence at the time of the allegedly wrongful retention, a finding which the parties do not seriously challenge.[5] Accordingly, we need only address the wrongful retention issue.

The question we face is whether Coppe's retention of Yarden was "wrongful" under Article 3. This inquiry, in turn, requires us to determine whether Coppe's action was in breach of Shalit's rights of custody under the law of the state of Yarden's habitual residence. *See* Hague Convention, art. 3, T.I.A.S. No. 11,670 at 4; *Friedrich I,* 983 F.2d at 1400; *see also* Perez–Vera Report at 435 (the law of the state of habitual residence "is taken into consideration only so as to establish the wrongful nature of the removal."). We look first to the law of Yarden's habitual residence-Israel-and then to the three sources of rights of custody as enumerated in the Hague Convention.

### A. Law of Habitual Residence—Israel

The Hague Convention's references to the "law of the State in which the child

---

5. It is undisputed that by the summer of 1998, Yarden had lived in Israel with his father for approximately three years and held a round-trip ticket to return after approximately two weeks. Three years is certainly enough time for Yarden to be considered "settled" in Israel, regardless of Coppe's claimed intention to have him return permanently to Alaska at some point in the future. *See, e.g., Feder v. Evans–Feder,* 63 F.3d 217, 224 (3d Cir.1995) (that the mother "did not intend to remain in

Australia permanently" after moving there from the United States with the father and child "does not void the couple's settled purpose to live as a family" in Australia); *Toren v. Toren,* 26 F.Supp.2d 240, 243 (D.Mass. 1998) (habitual residence was in United States with mother, regardless of fact that parents had agreed that children would return to Israel on a date certain and that United States was not intended to be the children's permanent residence).

was habitually resident" is purposefully broad. It is not limited to internal or domestic law but includes the conflict of law rules of the state of habitual residence. As explained in the Perez–Vera Report:

> [T]he Convention speaks of the 'law' of the· State of habitual residence, thus breaking with a long-established tradition of Hague Conventions ..., which refer to a particular internal law to govern the matters with which they deal.... [T]he adjective 'internal' implies the exclusion of all reference to the conflict of law rules of the particular legal system. Therefore, since the Convention has abandoned its traditional formulation by speaking of 'the law of the habitual residence,' this difference cannot be regarded as just a matter of terminology.

Perez–Vera Report at 445; *see also* Legal Analysis, 51 Fed.Reg. at 10506 ("Nothing in the Convention limits this 'law' to the internal law of the State of the child's habitual residence. Consequently, it could include the laws of another State if the choice of law rules in the State of habitual residence so indicate."). In determining whether Coppe's retention of Yarden was "wrongful," conflicts rules in Israel might direct us to look to the law of the United States. Or, the conflicts rules might result in Israeli law as controlling authority. Shalit, however, failed to provide any evidence regarding Israel's conflict of law rules in this case, where the child is a dual citizen, habitually resident in Israel and born in Israel to an American mother who holds a state court custody order in her favor.

**B. Rights of Custody**

■ Shalit also fails to persuade us that Coppe's retention of Yarden breached his "rights of custody" under the Hague Convention. Article 3 provides three potential sources of custody rights: (1) operation of law, (2) judicial or administrative decision, or (3)· an agreement having legal effect under the law of that State. *See* Hague Convention, art. 3, T.I.A.S. No. 11,670 at 5.[6]

**1. Operation of Law**

At summary judgment, Shalit offered only the declaration of an Israeli attorney—his own attorney in Israel—explaining that Shalit had custody rights under Israeli law because Israel's Legal Capacity and Guardianship Act of 1962 provides that both parents are the natural guardians of a child and that the guardianship of both parents includes the right to determine a child's residence.[7] Simply filing a declaration and saying it is so is not sufficient. Not only does Shalit bear the burden of proof under the Convention, but our analysis must be broader than the conclusory "evidence" offered by Shalit.

As explained above, the "law" referred to in Article 3 encompasses the conflict of law rules of the state of habitual residence, so that the inquiry into whether Shalit had custody rights necessarily entails a determination of whether Israel would apply its own or United States law in these circumstances:

> Thus, custody *ex lege* can be based either on the internal law of the State of the child's habitual residence, or on the

---

6. While we note that these sources are not exclusive, *see* Legal Analysis, 51 Fed.Reg. at 10506, Shalit did not offer or suggest any other basis for his claim to enforceable rights of custody under the law of Israel.

7. Article 14 of the Hague Convention provides that a court "may take notice directly of the law of, and of judicial or administrative decisions, formerly recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the

proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Hague Convention, art. 14, T.I.A.S. No. 11,670 at 8. Thus, an attorney's declaration as to the application of another country's law is generally acceptable in Hague Convention cases. Although the standards for proof of foreign law are relaxed under the Convention, the district court is not precluded from considering the source of the information, *i.e.*, the petitioner's own attorney.

law designated by the conflict rules of that State.

Perez–Vera Report at 446; *see also id.* (noting that in case where parents are French but child's habitual residence is Spain, "wrongfulness" would be determined by French law designated as applicable by Spanish conflict of law rules). Because the declaration of Shalit's attorney entirely ignored the conflict of law issue in concluding that Shalit had rights of custody under Israeli law, this declaration was insufficient to establish that Coppe's actions breached his rights of custody.

## 2. Judicial or Administrative Decision

The reference in Article 3 to a "judicial or administrative decision" as a source of custody rights is "used in its widest sense," specifically contemplating that such a decision "may have been issued by the courts of the State of the child's habitual residence as well as by the courts of a third country." *See* Perez–Vera Report at 446–47.

The only custody determinations in this case are the Alaska orders granting Coppe sole legal and physical custody of Yarden, with visitation to Shalit. The declaration offered by Shalit's attorney fails even to mention those decisions or to analyze a crucial issue in this case—the effect of the Alaska orders in determining the scope of Shalit's rights of custody under Israeli law. Shalit would have us ignore the Alaska orders which predated the claim of wrongful retention, but we are mindful that one of the purposes of the Hague Convention is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States," Hague Convention, art. 1b, T.I.A.S. No. 11,670 at 4.[8] Neither

Shalit's attorney's declaration nor Israel's Legal Capacity and Guardianship Act of 1962 provides any basis for us to assume that Israel would disregard this Convention objective by refusing to acknowledge the Alaska Superior Court's award of legal and physical custody to Coppe. Indeed, while we do not undertake such a determination, we note that at least one case from Israel suggests otherwise. *See* Dine Israel, *An Annual of Jewish Law: Past and Present,* Volumes X–XI 142 (1983) (discussing H.C. 386/78, *Magnesi v. Magnesi,* 32(3) P.D.I. 287, where the Israeli High Court "recogni[zed] . . . the judgment of the Italian court" which had granted custody to the mother, and ordered the father to return the child).

Under Article 17 of the Convention, a preexisting custody order should not be the "sole" reason for refusing to order the return of a child. Hague Convention, art. 17, T.I.A.S. 11,670 at 9. Although a preexisting custody order is not entitled to dispositive weight, the district court may take into account the reasons for and existence of such an order in determining whether a removal or retention is "wrongful" under the Hague Convention:

> The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

*See* Hague Convention, art. 17, T.I.A.S. No. 11,670 at 9; *see also Meredith v. Meredith,* 759 F.Supp. 1432, 1434–36 (D.Ariz. 1991) (relying on Article 17 to refuse the mother's Hague Convention petition because the Arizona state court had awarded the father "full, sole, and legal custody of

---

8. We recognize that this objective is, as a practical matter, not on equal footing with the first objective of the Convention—the return of wrongfully removed or retained children. *See* Perez–Vera Report at 430. Nonetheless, the determination of whether Coppe's retention of Yarden was "wrongful" must be considered in light of this secondary purpose of the Convention, and we in no way derogate from the goals of the Convention by acknowledging its aim of ensuring that signatory nations respect the rights of custody granted by the authorities of other nations.

the minor child," so that the mother had "mere physical possession of the minor child ... and [ ] did not have any legal rights of custody of said child" at the time the father allegedly wrongfully removed their daughter).

The rationale for this provision is to prevent abductors from being able to rely upon either a " 'dead' decision taken prior to the removal but never put into effect," see Perez–Vera Report at 464, or a decision obtained by an abductor in the country of refuge "before the court had notice of the wrongful removal or retention." Legal Analysis, 51 Fed.Reg. at 10504. Neither of these circumstances is applicable here; the Alaska orders were obtained (with Shalit's participation and representation by counsel) and implemented for years prior to the alleged wrongful retention. The Alaska orders were entered because the parties were living in Alaska at the time of the divorce and Yarden was resident in Alaska. Even upon modification of the original order, the parties stipulated that jurisdiction would remain in the Alaska courts. The orders were not entered surreptitiously or to gain a jurisdictional or procedural advantage in these proceedings.

### 3. Agreement Having Legal Effect

Shalit claims that he had rights of custody because Israel permits parents living separately to agree upon matters relating to guardianship (such as the child's place of residence), which Shalit and Coppe did by agreeing that Yarden would live in Israel for three years. This argument, too, fails.

Article 3 states that rights of custody may arise "by reason of an agreement having legal effect under the law of [the state of habitual residence]." Hague Convention, art. 3, T.I.A.S. No. 11,670 at 5. Again, even assuming that Israel's "law" would point to its internal law under a conflicts of law analysis, the declaration of Shalit's attorney ignores the fact that Is-

raeli law specifically provides that an agreement between parents living separately "shall be subject to the approval of the Court":

> *Agreement between parents who live separately.* Where the parents of the minor live separately ... they may agree between them as to which of them shall ... have custody of the minor and what shall be the rights of the other parent with regard to having contact with him. Such an agreement shall be subject to the approval of the Court....

Israeli Legal Capacity and Guardianship Act of 1962, Article 24.

Shalit's and Coppe's oral agreement was never approved by an Israeli or American court. Shalit does not address this language or explain its legal effect. Based upon the proof offered, the agreement is not a source from which Shalit may derive rights of custody. *Cf. Currier v. Currier*, 845 F.Supp. 916, 921 (D.N.H.1994) (rejecting argument based on purported agreement between the parents because such agreement "is, under German law, without legal effect until approved by court order.").

In summary, the district court did not err in granting summary judgment to Coppe. Shalit failed as a matter of law to establish that Coppe's retention of Yarden was in breach of Shalit's rights of custody under the law of Israel and therefore "wrongful" under the Convention.

### III. SHALIT'S MOTION FOR RECONSIDERATION

■ After entry of the order granting Coppe's motion for summary judgment and denying Shalit's motion for summary judgment, Shalit filed a motion for reconsideration, this time attaching the declaration of a different Israeli attorney as well as a letter from the Israeli Ministry of Justice, both of which opined that Coppe wrongfully retained Yarden under Article 3 of the Hague Convention.[9]

---

9. Although it is unclear from both the briefs

and the Notice of Appeal, counsel stated at

The law is clear that reconsideration is appropriate only in very limited circumstances, and that "[t]he overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late filed documents into 'newly discovered evidence.'" *School Dist. No. 1J, Multnomah County v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (citation omitted); *see also Rosenfeld v. U.S. Department of Justice*, 57 F.3d 803, 811 (9th Cir.1995) (no abuse of discretion in declining to consider an argument "raised for the first time on reconsideration without a good excuse"); *Hopkins v. Andaya*, 958 F.2d 881, 887 n. 5 (9th Cir. 1992) ("A defeated litigant cannot set aside a judgment because he failed to present on a motion for summary judgment all the facts known to him that might have been useful to the court."). Shalit offered no reason for his failure to present such evidence prior to entry of judgment against him, and the district court did not abuse its discretion in denying the motion for reconsideration.

**AFFIRMED.**

oral argument that Shalit intended to appeal from the denial of his motion for reconsideration as well as the grant of summary judgment in favor of Coppe.